IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | No. 1:21cr31 |
| MICHAEL C. MYERS, Defendant. | |

### Statement of Facts

The United States and the defendant, **Michael C. Myers**, stipulate that the allegations in the one-count Criminal Information and the following facts are true and correct. The United States and **Myers** further stipulate that had the matter gone to trial, the United States would have proven the allegations in the Criminal Information and the following facts beyond a reasonable doubt.

**I.    Introduction**

1.     As set forth in greater detail below, beginning in or about November 2013 and continuing thereafter through in or about June 2015, in the Eastern District of Virginia and elsewhere, defendant **Michael C. Myers** unlawfully, voluntarily, intentionally, and knowingly conspired, combined, confederated, and agreed with K.S. and others to commit wire fraud, that is: having knowingly devised and intending to devise a scheme and artifice to defraud Prime Contractor #1, Prime Contractor #2, the National Aeronautics and Space Administration ("NASA"), and others, and to obtain from Prime Contractor #1, Prime Contractor #2, NASA, and others money and property by means of material false and fraudulent pretenses, representations, and promises, to transmit and cause to be transmitted by means of wire communication in interstate commerce writings, signs, and signals for the purpose of executing the scheme and artifice, in violation of Title 18, United States Code, Section 1343.

2.     More specifically, starting in or about November 2013 and lasting through in or about June 2015, **Myers** conspired with K.S. and others to defraud Prime Contractor #1, Prime Contractor #2, NASA, and others by, among other things:

a.    fraudulently representing to various U.S. government prime contractors, the U.S. government (including NASA), and others that Company A was a woman-owned small business ("WOSB") as defined by the Small Business Administration ("SBA");

b.    fraudulently representing to various U.S. government prime contractors, the U.S. government (including NASA), and others that A.R., the majority owner of Company A on paper, controlled Company A on a day-to-day basis, when in fact A.R. did not do so; and

c.    fraudulently obtaining approximately $1,474,634.01 in profits for Company A as a purported WOSB subcontractor on U.S. prime government contracts.

## II.     Factual Background

### A.     *Myers, Company A, and Company B*

3.     Company A is a Florida corporation that was created in or about 1994 to provide various contracting support services at the Kennedy Space Center and Cape Canaveral Air Force Station. Company A was formed by individuals working for Company B, a Pennsylvania-based company that provides custom fabrication and other services nationwide. The purpose of creating Company A was for Company B to acquire the Florida-based subsidiary of a large and well-known U.S. government contractor after that contractor decided to part ways with the subsidiary.

4.     **Myers's** father, L.M., founded Company B in or about 1974 and fully owned it at the time of its formation, eventually transferring shares in the company to **Myers** and **Myers's** brother over time before L.M's death in July 2013. When Company B formed Company A, Company B (and thus L.M.) owned 49% of Company A, and A.R., a woman who worked full-

time in administrative support for Company B, owned 51% of Company A. In April 2013, A.R. retired, and in August 2014, **Myers** and his brother purchased A.R.'s shares in Company A. After that purchase, **Myers** owned 85% of both Company A and Company B, and his brother owned the remaining 15% in both companies.

5.      From the inception of both companies until shortly before his death, L.M. controlled both Company A and Company B from Company B's offices in Pennsylvania. In the time period leading up to and after L.M.'s death, **Myers** took over control of both Company A and Company B, taking on the titles of President and CEO for both companies. The day-to-day operations of Company A were generally handled throughout its existence by individuals located at Company A's office in Florida, reporting ultimately to L.M. (and later **Myers**) at Company B. One of these individuals was K.S., whom **Myers** hired in or about February 2014 to be the general manager of Company A. Another was G.A.K., who was terminated from Company A for cause in or about April 2012. During the time **Myers** worked with both K.S. and G.A.K, both individuals reported to **Myers** and/or **Myers**'s father, not A.R., and A.R. was neither involved in the day-to-day operations of Company A nor exercising ultimate control over the company.

    *B.*    *Government Contracting Preferences for Woman-Owned Small Businesses*

6.      The SBA administers several programs designed to help different types of small businesses compete in the American economy through access to the federal procurement market. One of those programs is for women-owned small businesses, otherwise known as "WOSBs." In order to obtain access to federal government contracting preferences available to WOSBs, a WOSB must be at least 51 percent owned and operated by one or more women, and one or more women must control the company's management and daily operations. In addition, a woman must

hold the highest officer position, manage the company on a full-time basis, and devote herself full-time to the company during its normal working hours.

7.     Pursuant to the applicable federal regulations, U.S. government prime contractors may rely in good faith on written representations by subcontractors claiming that they meet the criteria outlined above for WOSBs. Moreover, WOSBs may self-represent their status as a qualified WOSB directly to the government, and prime contractors may rely in turn on those self-representations. To self-represent, a claimed WOSB must register in a centralized electronic U.S. government database designed to track such information. From in or about December 2004 through in or about July 2012, that system was the Online Representations and Certifications Application ("ORCA"). From in or about July 2012 to the present, that system was the System for Award Management ("SAM"), administered by the General Services Administration ("GSA"). When a company or individual accesses SAM, either to make certifications or to access certifications made by others, that company or individual accesses GSA servers located in Sterling, Virginia, within the Eastern District of Virginia.

8.     As part of administering its various small business contracting preferences, including WOSB preferences, the SBA administers Small Business Development Centers ("SBDCs") nationwide. The SBA provides 50 percent or less of the operating funds for each state SBDC, and sponsors (including state legislatures, private sector foundations, public and private universities, and other organizations) provide the remaining funds. The SBDC program is designed to deliver up-to-date counseling, training, and technical assistance in all aspects of small business management to businesses seeking to use the SBA's various programs.

C.    *Company A's Use of Claimed WOSB Status to Obtain Government Contracting Work*

9.      According to available SAM and ORCA records, Company A certified itself in ORCA and SAM as a WOSB from at least on or about January 10, 2008, through on or about June 25, 2015.

10.     On or about December 17, 2010, NASA awarded U.S. government contract # NNK11EA08C, also known as the "Engineering Services Contract" or "ESC," to Prime Contractor #1, which provided technology development and products to the defense, security, and commercial markets worldwide. Prime Contractor #1 was headquartered in Waltham, Massachusetts, and maintained offices in Pittsburgh, Pennsylvania, and Ashburn, Virginia, within the Eastern District of Virginia. The ESC, the largest commercial contract at the Kennedy Space Center in Florida during that timeframe, required Prime Contractor #1 and its subcontractors to provide highly specialized technical services to help NASA modernize its systems and infrastructure in order to meet its strategic space technology objectives.

11.     NASA awarded the ESC to Prime Contractor #1 based at least in part on Prime Contractor #1's representation that it would use Company A as a WOSB subcontractor, and Prime Contractor #1 made that representation based on Company A's representation that it was a WOSB. Company A's representations that it was a WOSB, both within SAM and in the documents provided directly to Prime Contractor #1, were material to Prime Contractor #1's selection of Company A as a subcontractor to Prime Contractor #1 under the ESC because NASA had to meet certain small business goals in its awarding of contracts and subcontracts, and Prime Contractor #1 could thus earn additional scoring or points for a contract proposal containing WOSBs as anticipated subcontractors.

12.     Prime Contractor #1 approved and made its payments to Company A based on invoices and other information submitted by Company A in Florida and sent either directly or through a Prime Contractor #1 intermediary by interstate wire communication (*i.e.*, email) to Prime Contractor #1's accounts payable department in Ashburn, Virginia, within the Eastern District of Virginia.

13.     On or about August 13, 2014, Company A submitted a proposal to Prime Contractor #2, a global design, engineering, construction, and technical services firm, for subcontracting work on a NASA prime contract. In that proposal, Company A represented itself to be a WOSB in multiple documents. In or about September 2014, Prime Contractor #2 awarded the subcontract to Company A. NASA officials approved the subcontract, specifically finding that Prime Contractor #2 was in compliance with prime contract requirements regarding small business subcontracting because Company A "is a WOSB concern." That finding by NASA was based in part on information obtained from accessing Company A's representation to that effect in SAM, which Prime Contractor #2 accessed in turn via SAM on or about September 11, 2014.

### III.     Criminal Conduct

14.     After A.R.'s retirement in April 2013 and L.M.'s death in July 2013, **Myers** became more familiar with the definitions and rules regarding WOSB status and Company A's claims that it qualified as a WOSB. By November 2013, **Myers** was aware both that Company A did not qualify as a WOSB and that it had falsely represented itself as a WOSB in order to obtain the subcontract with Prime Contractor #1. Nevertheless, as set forth in greater detail below, **Myers** continued to represent, and instruct other Company A employees to represent, that Company A was a WOSB. This included, among other things, **Myers**'s general instruction to K.S. that Company A continue falsely representing itself as a WOSB to obtain a future subcontract with

Prime Contractor #2, even though **Myers**, K.S., and others understood that Company A did not qualify as a WOSB.

15.     For example, on or about October 31, 2013, **Myers** submitted a joint "Business Report" to the bank utilized by both Company A and Company B in order to renew the companies' line of credit with that bank. In that report, **Myers** noted that the prior year "has been an especially challenging" one for the companies, in part based on "the retirement of [A.R.] from the company." In response, a bank official emailed **Myers** on November 14, 2013, and asked, "How will the retirement of [A.R.] affect the minority ownership status of [Company A] and their ability to gain government contracts in the future as well as the effect on existing contracts?" By this point, **Myers** understood both that Company A was not a legitimate WOSB, that it had falsely represented itself as such to Prime Contractor #1, and that it intended to falsely represent itself as such in its upcoming bid to Prime Contractor #2.

16.     Nevertheless, **Myers** responded to the bank official that same day and made several false and misleading statements. For example, **Myers** falsely claimed that the Company A subcontract with Prime Contractor #1 "is small business status only," even though **Myers** knew by that time that Company A had represented itself as a WOSB to Prime Contractor #1. **Myers** acknowledged, however, that "if we want to pursue other government contracts," A.R.'s retirement "may be of more importance." **Myers** further wrote:

> If necessary my wife will become the 51 percent share holder although this is not my preference and doing so may not help our cause. The trend is for certification of minority status and just having a wom[an] as a 51% share holder does not meet this requirement. In other words I would need to sell the business to a wom[an] manager that worked for [Company A] 100% of the time in order to meet the emerging guide lines.

**Myers** knew that there was no such "trend" or "emerging guidelines." Rather, **Myers** wrote the misleading passage above in order to conceal his knowledge, by that time, that Company A did not meet the definition of a WOSB despite having represented itself as such to Prime Contractor #1. In addition, **Myers** understood by this time that Company A's continued representation of itself as a WOSB in SAM was false and misleading, as well as that its future representations of WOSB status to other contractors, like Prime Contractor #2, would be false and misleading.

17.     In or about late December 2013, **Myers** and H.G.E., then the chief operating officer for Company B, telephonically interviewed K.S. to become the Florida-based general manager of Company A. During the interview, **K.S.** asked whether Company A was a WOSB because, as the participants on the call understood, such a status was valuable to Company A obtaining U.S. government contracting opportunities. **Myers** asserted to K.S. that Company A was a WOSB until a formal ownership transition to **Myers** and his brother was completed, even though **Myers** knew by that time that A.R.'s formal ownership of a majority of Company A's shares was not sufficient to qualify it as a legitimate WOSB. **Myers** subsequently hired K.S., who began working for Company A in Florida in or about March 2014 without having met A.R. During the entirety of K.S.'s employment with Company A through May 2016, K.S. reported to **Myers** and had no substantive interaction with A.R. on Company A matters because A.R. was fully retired by that point. K.S. only met A.R. on a single occasion at Company B's Pennsylvania office in **Myers's** presence.

18.     Nevertheless, at **Myers's** general direction, K.S. and others continued to make false representations that Company A was a WOSB in order to obtain contracting work, and K.S. kept **Myers** informed of his efforts on regular weekly calls regarding Company A matters. Those included opportunities with Prime Contractor #1, which was the primary source at that time of

Company A's government subcontracting work at the Kennedy Space Center. More specifically, on or about April 9, 2014, K.S. emailed a subcontracts administrator with Prime Contractor #1 and attached a "capabilities brochure," which according to K.S. "include[d] our licenses and certifications." That capabilities brochure represented Company A as a WOSB. K.S. sent the email to ensure that Prime Contractor #1 would select Company A for as much subcontracting work as possible pursuant to the companies' subcontracting agreement.

19.     Subsequently, on or about April 16, 2014, K.S. attended an "Industry Day Forum" hosted by the Florida SBDC, in partnership with Eastern Florida State College ("ESFC") and the University of Central Florida ("UCF"), in Cocoa Beach, Florida. The purpose of the forum was to discuss the construction process for the U.S. Department of Veterans Affairs Cape Canaveral National Cemetery, including small business participation in that effort. One day after the event, K.S. emailed P.S., an individual affiliated with UCF and the Florida SBDC, requesting a meeting to learn about "the support the SBDC may be able to offer my company." K.S. went on to state that company, Company A, was a WOSB that "has not grown and in fact has contracted in recent years." K.S. sought assistance from P.S. because K.S. had been "hired recently to improve business operations and to grow the business." K.S.'s attendance at the Industry Day Forum and his subsequent correspondence with P.S. was consistent with **Myers**'s general direction to K.S. to seek additional contracting opportunities for Company A by falsely claiming WOSB status.

20.     On or about May 6, 2014, K.S. also emailed a U.S. government contractor regarding a potential opportunity to work on a U.S. Air Force project at Cape Canaveral Air Force Station. In that email, K.S. twice asserted that Company A was a Florida-based WOSB. K.S. again attached the Company A capabilities brochure, which represented Company A to be a WOSB, to that email. K.S. then forwarded the email to **Myers** and H.G.E.

21.    On May 14, 2014, **Myers** emailed a link to an article published by the American Bar Association ("ABA") regarding WOSB requirements to K.S., H.G.E., and **Myers**'s brother. The article, which **Myers** read and discussed both over email and in person with K.S. and H.G.E., stated, among other things:

> The requirements for control of the WOSB are somewhat stringent, reflecting the legitimate need to guard against firms attempting to qualify for WOSB status when the woman is merely a figurehead for the company. The management and daily business operations of the concern must be controlled by one or more women. This means that both the long-term decision making and the day-to-day management and administration of the business operations must be conducted by one or more women. Further, a woman must hold the highest officer position in the concern and must have managerial experience of the extent and complexity needed to run the company. The woman who holds the highest officer position also must manage it on a full-time basis, must devote full-time to the business concern during normal working hours, and must not engage in outside employment that prevents her from devoting sufficient time and attention to daily business.

In **Myers**'s initial email sending the article, he stated, "Researching the WOSB certification status it seems as though we could remain self certified if my wife was made 51% share holder, However, she would have to leave her current job and work full time for the company."

22.    On May 14, 2014, H.G.E. responded to the above email from **Myers** regarding the ABA article on WOSB status. Specifically, H.G.E. wrote to **Myers**, K.S., and **Myers**'s brother, "If the article is accurate and the explanations of certification are correct (no reason to believe otherwise), then I think we're on very thin ice as 'self-certified' since [Company A] does not meet the standards for daily business operations controlled by a woman. And, I can't imagine [A.R.] agreeing to become involved in daily operations at this point." H.G.E. continued, "As I see it, we are at risk for any 'interested party' to challenge the 'self-certified status' if we were to claim it."

23.     Following H.G.E.'s May 14, 2014, email to **Myers**, K.S., and **Myers**'s brother, **Myers**, K.S., and H.G.E. discussed what to do regarding Company A's representations about WOSB status. Those discussions occurred over time at both regular weekly meetings and otherwise, and occurred both in person and over the phone. Because **Myers** controlled both Company A and Company B at that time, **Myers** led the discussions and made all final decisions. In those conversations, **Myers** conveyed to K.S. and H.G.E. that **Myers** wanted Company A to continue to represent itself as a WOSB until after **Myers** bought A.R.'s shares in Company A, even though Company A did not actually qualify as a WOSB. In those conversations and his subsequent actions, K.S. conveyed and demonstrated his agreement to continue making that false representation on Company A's behalf and at **Myers**'s general direction. For example, at **Myers**'s direction, K.S. revised Company A's "Business Plan" document to include the statement that an ongoing activity at Company A was "to acquire the 51% share from [A.R.] essentially making [Company A] a Small Business versus a Small Woman-Owned business." As **Myers**, K.S., and H.G.E. knew, however, Company A was already not a legitimate WOSB, and the purpose of this misleading statement in Company A's business plan was to conceal the ongoing fraud scheme.

24.     **Myers** knew that this general direction to K.S., and K.S.'s agreement to carry out that direction, would result in material false statements being made both to the U.S. government and to prospective prime contractors with which Company A was seeking work. For example, **Myers** knew that companies seeking to do U.S. government contracting work, including as subcontractors, typically certified various statuses, including WOSB status, in the SAM system. **Myers** thus knew that he had generally instructed, and K.S. agreed, to represent Company A as a WOSB for any upcoming projects, even though that representation was false. **Myers** also knew that U.S. government prime contractors relied on statements regarding statuses like WOSB status

11

in awarding subcontracts to companies like Company A. Specifically, **Myers** knew as of May 2014, based on conversations with K.S. and H.G.E., among others, that Company A was planning to bid on a subcontract with Prime Contractor #2 later that year, and that based on **Myers's** instruction and K.S.'s agreement, Company A would falsely represent itself as a WOSB on the documentation it submitted to Prime Contractor #2.

25.     Thereafter, on or about June 4, 2014, K.S. met with P.S. from the Florida SBDC pursuant to his email from April 2014 referenced above for a "counseling appointment." Later that same day, P.S. emailed K.S. information regarding how to update a company's status and certifications in SAM, as well as attachments with highlighted information about SBA contracting preferences. In the email, P.S. noted for K.S. that when prime contractors visit the website for a subcontractor, one thing "they look for" is the company's "[s]mall business designation (WOSB, etc.)." One of the attachments to that email included yellow highlighting in a section titled "WOSB Program Eligibility Requirements." The highlighted language included that the "woman must hold the highest officer position," that the "woman must manage the day-to-day operations" of the company on a "full-time basis and devote full-time to the business concern during the normal working hours of business concerns in the same or similar line of business." The yellow-highlighted language also included the requirement that the "woman must make the long term decisions" for the company. **Myers** knew that Company A did not meet any of these criteria, and K.S. continued falsely representing Company A as a WOSB after P.S. sent the information above because of **Myers's** general direction that Company A continue making that false representation so long as A.R. owned 51% of Company A's shares.

26.     Five days later, on June 9, 2014, K.S. emailed P.S. a Company A "capabilities statement" that falsely claimed Company A was a WOSB. The next day, K.S. sent the capabilities

statement to **Myers**, H.G.E., and R.G., a Company B engineer. In the email, K.S. stated, "To work with the Government, you have to have a capabilities statement. Attached is the one I drafted for my meeting with the SBDC last week." After H.G.E. reviewed and approved the statement with minor edits on or about June 20, 2014, R.G. responded by email and asked, "Is [Company A] still 'woman owned'?" On June 23, 2014, K.S. emailed and falsely stated, "At the moment yes but could change in the very near future." **Myers** knew that this statement was false and misleading because Company A did not actually qualify as a WOSB, and the only change under consideration was a change in ownership shares from A.R. to **Myers**. But as **Myers** had known since at least November 2013, and reaffirmed in the May 2014 email exchange above, share ownership was only one of the requirements for WOSB status, and Company A did not otherwise qualify as a WOSB.

27.     On or about July 8, 2014, during a trip to Company B's office in Pennsylvania, K.S. met and spoke to A.R. for the first and only time in **Myers**'s presence. A.R., who had fully retired in or about April 2013, was present at Company B's offices primarily to discuss ongoing negotiations with **Myers** and his brother to sell her shares in Company A.

28.     On or about July 9, 2014, while at Company B's offices in Pennsylvania with **Myers**, K.S. falsely certified Company A as a WOSB in SAM for the purpose of obtaining future U.S. government contracting work. **Myers** knew that this certification was false.

29.     On or about July 16, 2014, Prime Contractor #2 sent Company A a request for proposal ("RFP") on an upcoming government subcontracting opportunity that Company A had been expecting. K.S. forwarded the RFP to **Myers** and H.G.E. by email on July 18, 2014, and wrote, "We need to meet on this to develop a strategy."

30.     On or about August 13, 2014, Company A submitted its subcontracting bid to Prime Contractor #2. The materials included a Prime Contractor #2 "Representations and Certifications"

form that was signed by K.S. That form included a warning that misrepresenting a firm's status in order to obtain a contract based on SBA preferences could be punished by, among other things, imprisonment. On that form, K.S. falsely represented Company A as a WOSB even though the form included the two-part definition of a WOSB being a company that is both 51-percent-owned by a woman and "[w]hose management and daily business operations are controlled by one or more women." The Company A bid also included a single-page Prime Contractor #2 "Vendor Size Status Certification," which K.S. also signed. K.S. also falsely represented Company A to be a WOSB on this form, even though it also included the same two-part definition of a WOSB.

31.     On or about August 15, 2014, K.S. emailed **Myers** and H.G.E. to notify them that Prime Contractor #2 had invited Company A to a pre-award meeting that same day and that "[a]ll indications are we have been selected and need to address any questions or concerns they may have. Keep your fingers crossed." K.S. also forwarded **Myers** and H.G.E. an email from Prime Contractor #2 with additional details about the meeting. **Myers** responded, "Good luck with the discussion. Wish I was there to help." After the meeting, K.S. wrote to **Myers** and H.G.E., "Just came from the meeting. Everything went well. Recommendation going to NASA for approval. Big win for [Company A]." **Myers** responded, "Congratulations to the [Company A] Team! You made my day!!!!"

32.     Four days later, on or about August 19, 2014, **Myers** signed a stock purchase agreement and other documents with A.R. formally purchasing her shares in Company A. **Myers** had delayed the negotiations with A.R. over this share purchase until after Company A had submitted its proposal to Prime Contractor #2 to conceal the ongoing false representation of Company A as a WOSB. **Myers** did not disclose the timing of the sale relative to the Prime

14

Contractor #2 proposal to A.R. In an email to H.G.E. that day, **Myers** wrote that Company A "was drained of $115,000 for biz transfer. Deal is done."

33.     Subsequently, in or about September 2014, Prime Contractor #2 formally awarded the subcontract to Company A. Based on email correspondence that was sent to **Myers**, he knew that the subcontract with Prime Contractor #2 was not finalized until September 2014, after A.R. no longer owned any shares in Company A. Neither **Myers** nor any other Company A official notified Prime Contractor #2 before the award of the subcontract that A.R. was no longer the majority owner of Company A.

34.     Following the award of the Prime Contractor #2 subcontract to Company A, **Myers** conveyed that award to the bank that provided the line of credit for Company A and Company B. That bank then renewed Company A's line of credit in late November 2014.

35.     Company A thereafter continued to represent itself as a WOSB even though **Myers** and K.S. knew the company did not qualify. For example, on or about November 26, 2014, K.S. sent a revised version of the capabilities statement to various Company A employees, instructing them to "send this to potential clients that express interests in our services and capabilities." K.S. copied **Myers** on this email. Although K.S. had updated the statement to include Company A's work for Prime Contractor #2, the statement still falsely claimed that Company A was a WOSB. On or about December 11, 2014, K.S. emailed the capabilities statement with the false WOSB claim to Company A's web designers, copying **Myers** and asking for the statement to be uploaded to the company website.

36.     On or about February 12, 2015, **Myers** electronically signed Company B's annual report with the State of Florida, which removed A.R. for the first time since the company's formation.

37.     On or about May 18, 2015, K.S. sent the Company A web designers a revised company brochure and capabilities statement, copying **Myers** on the email. In his email to the web designers, K.S. stated that he "removed Women-Owned business as that has recently changed." As **Myers** knew, this statement was false and misleading because Company A had not qualified for WOSB status for some time, and the change was not "recent" at all.

38.     On or about June 25, 2015, K.S. completed Company A's SAM certification but removed Company A's representation that it was a WOSB for the first time. Thereafter, in or about November 2015, K.S. submitted a revised vendor size status certification form to Prime Contractor #2 that changed Company A's WOSB status to indicate that it was no longer a WOSB. Similarly, on or about February 16, 2016, a Company A employee emailed Prime Contractor #1 a business size / classification self-certification form that did not include the WOSB designation for Company A (even though the form included that option).

39.     In total, from November 2013 through the time that K.S. changed Company A's SAM certification in June 2015, Company A obtained approximately $6,849,614.85 in payments from Prime Contractor #1 for ESC subcontracting work and approximately $1,826,275.06 in payments from Prime Contractor #2 for the subcontract awarded in or about September 2014. Company A in turn earned approximately $1,248,232.83 in profits on the payments from Prime Contractor #1 and approximately $226,401.18 in profits on the payments from Prime Contractor #2, for a total of approximately $1,474,634.01 in profits during this timeframe. Based on **Myers**'s 41.65% ownership stake in Company A through August 2014 (85% of his father's original 49% share) and 85% ownership stake in Company A after A.R. sold her shares in August 2014, **Myers** obtained a total of $893,062.77 in illegal proceeds from his criminal conduct.

40.     On or about July 7, 2016, law enforcement officials executed search warrants at the Company A and Company B premises in Florida and Pennsylvania, respectively. That same day, law enforcement agents interviewed **Myers** regarding Company A. In that interview, **Myers** admitted that his father controlled Company A before his death and that **Myers** became more involved in the company's operations in or about 2011. **Myers** acknowledged that individuals at Company A's Florida office ran its day-to-day operations and that A.R.'s involvement did not meet the definition of what was required for a WOSB. **Myers** falsely claimed, however, that Company A had not represented itself as a WOSB to Prime Contractor #1.

41.     On or about July 8, 2016, **Myers** called A.R. and left a voicemail stating that it "has been a while." After referencing A.R.'s communications with **Myers**'s brother since the search warrant, **Myers** went on to state:

> Obviously in light of activities that happened the last couple days, uh, thought we should reach out, see how you're doing, find out when we might be able to meet to just talk about, uh, the situation and hope that we can clear this up as quickly as we can and uh, make everybody uh, confident that uh, you know, we were doing things, uh, we did things the way we should or that if we didn't, we didn't understand that.

As **Myers** knew, Company A had not been "doing things . . . the way [they] should," and it was misleading to state that "if we didn't, we didn't understand that" because **Myers** knew that Company A had falsely represented itself as a WOSB. Nevertheless, A.R. did not return **Myers**'s call, and **Myers** did not speak to A.R. about the investigation.

## IV.    Conclusion

42.     **Myers**'s actions in furtherance of these offenses, including but not limited to the acts described above, were done willfully, knowingly, with the specific intent to violate the law, and not because of accident, mistake, or innocent reason.

43.     The foregoing statement of facts is a summary of the principal facts that constitute the legal elements of conspiracy to commit wire fraud. This summary does not describe all of the evidence that the United States would present at trial or all of the relevant conduct that would be used to determine **Myers**'s sentence under the Sentencing Guidelines. **Myers** acknowledges that the foregoing statement of facts does not describe all of **Myers**'s conduct relating to the offense charged in this case.

Respectfully submitted,

G. Zachary Terwilliger
United States Attorney

By:

Samantha P. Bateman
Assistant United States Attorney
Ryan S. Faulconer
Special Assistant United States Attorney

18

Defendant's Stipulation and Signature: After consulting with my attorney and reviewing the above statement of facts, I stipulate that the above statement of facts is true and accurate. I further stipulate that had the matter proceeded to trial, the United States would have proven the same beyond a reasonable doubt.

Michael C. Myers
Defendant

Defense Counsel Signatures: I am Michael C. Myers's attorney. I have carefully reviewed the above statement of facts with him. To my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

Jack L. Gruenstein
Counsel for the Defendant

Joseph G. Poluka
Counsel for the Defendant

19